No. 24-60651

# In the United States Court of Appeals for the Fifth Circuit

———————

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

———————

*On Appeal from a Decision of the National Labor Relations Board,*
*Nos. 31-CA-299464, 31-CA-305504, 31-RC-296066*

## BRIEF OF PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION

———————

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  *41 S. High Street, Ste. 3250*
  *Columbus, OH 43215*

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  *1111 E. Kilbourn Avenue, Ste. 1000*
  *Milwaukee, WI 53202*

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
MARK S. STORSLEE
CLAIRE R. CAHILL
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Petitioner/Cross-Respondent*

## CERTIFICATE OF INTERESTED PERSONS

### Case No. 24-60651

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Petitioner/Cross-Respondent:**

- Starbucks Corporation

**Respondent/Cross-Petitioner:**

- National Labor Relations Board

**Counsel for Petitioner/Cross-Respondent:**

- Lisa S. Blatt
  Amy Mason Saharia
  Mark S. Storslee
  Claire R. Cahill
  Williams & Connolly LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com
  asaharia@wc.com
  markstorslee@wc.com
  ccahill@wc.com
- Jeffrey S. Hiller
  Littler Mendelson, P.C.
  41 S. High Street, Ste. 3250
  Columbus, OH 43215
  (614) 463-4230
  jhiller@littler.com

- Jonathan O. Levine
  Littler Mendelson, P.C.
  1111 E. Kilbourn Avenue, Ste. 1000
  Milwaukee, WI 53202
  (414) 291-5537
  jlevine@littler.com

**Counsel for Respondent/Cross-Petitioner:**

- Ruth E. Burdick
  Micah Jost
  Kira Vol
  National Labor Relations Board
  1015 Half Street, S.E.
  Washington, DC 20570
  (202) 273-2960
  appellatecourt@nlrb.gov
  micah.jost@nlrb.gov
  kira.vol@nlrb.gov
- M. Kathleen McKinney
  National Labor Relations Board
  600 S. Maestri Place
  New Orleans, LA 70130
  (504) 589-6361


Counsel further certifies that Starbucks Corporation has no parent company and that no public company owns 10% or more of its shares.

_s/ Lisa S. Blatt_

LISA S. BLATT
*Attorney of Record for*
*Petitioner/Cross-Respondent*

## STATEMENT REGARDING ORAL ARGUMENT

Respondent Starbucks Corporation requests oral argument pursuant to Fifth Circuit Rule 28.2.3.  This case presents significant questions regarding whether the National Labor Relations Board's order exceeded the Board's statutory authority and violates the substantial-evidence standard, and whether the Board's compensatory-damages remedy exceeds the Board's statutory authority and violates the Constitution.  Oral argument will assist the Court in resolving these important issues.

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES .........................................................................1

INTRODUCTION.................................................................................................2

STATEMENT OF THE CASE ............................................................................5

    A.    Factual History ......................................................................5

    B.    Procedural History ............................................................18

SUMMARY OF ARGUMENT .........................................................................21

STANDARD OF REVIEW ...............................................................................26

ARGUMENT ......................................................................................................27

I.    THE BOARD ERRED IN CONCLUDING THAT
STARBUCKS TERMINATED UNTARAN'S EMPLOYMENT
FOR UNION ACTIVITY .......................................................................27

    A.    The NLRA Prohibits Discharges Only When Based on
Animus Toward Union Activity ......................................28

    B.    The ALJ's Animus Finding Lacks Substantial Evidence ............29

    C.    The ALJ's Finding that Starbucks Would Not Have
Terminated Untaran's Employment Absent Animus Lacks
Substantial Evidence ........................................................39

II.    THE BOARD ERRED IN CONCLUDING THAT
STARBUCKS' SPEECH VIOLATED SECTION 8(a)(1)...................44

    A.    Starbucks Did Not Threaten Sosa with Reprisal..........................46

    B.    Starbucks Did Not Threaten Ramirez and Untaran with
Reprisal ..............................................................................48

    C.    Starbucks Did Not Threaten Pichardo with Reprisal .................52

III.    THE BOARD ERRED IN CONCLUDING THAT
STARBUCKS CONDUCTED A COERCIVE
INTERROGATION ................................................................................55

IV.    THE BOARD'S ORDERED REMEDIES ARE UNLAWFUL.........60

    A.    The Evidence Does Not Support the Ordering of a Second
Election..............................................................................60

    B.    The Board's Damages Remedy Is Unlawful.................................61

CONCLUSION....................................................................................................67

# TABLE OF AUTHORITIES

Page

## CASES

*3484, Inc. v. NLRB*, 137 F.4th 1093 (10th Cir. 2025)..............................62

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)............................64

*Arc Bridges, Inc. v. NLRB*, 861 F.3d 193 (D.C. Cir. 2017)....................47

*Asarco, Inc. v. NLRB*, 86 F.3d 1401 (5th Cir. 1996)......................30, 37

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)................26

*Brown & Root, Inc. v. NLRB*, 333 F.3d 628 (5th Cir. 2003) ....................*passim*

*Camaco Lorain Mfg. Plant*, 356 NLRB 1182 (2011)..........................58

*Carey Salt Co. v. NLRB*, 736 F.3d 405 (5th Cir. 2013)......................26

*Chamber of Com. v. Brown*, 554 U.S. 60 (2008)..............................44

*Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224 (3d Cir. 2001)............1

*Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245 (5th Cir. 1992)................60

*Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130 (D.C. Cir. 1994)..............49, 50

*Curtis v. Loether*, 415 U.S. 189 (1974)......................................64

*Delco-Remy Div., Gen. Motors Corp. v. NLRB*,
    596 F.2d 1295 (5th Cir. 1979)......................................55, 57, 58

*Denton Cnty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161 (5th Cir. 2020) ..........41

*Dish Network Corp. v. NLRB*, 953 F.3d 370 (5th Cir. 2020) ...................*passim*

*Dow Chem. Co. v. NLRB*, 660 F.2d 637 (5th Cir. 1981)......................55, 57

*Ex parte Lennon*, 166 U.S. 548 (1897)......................................63

*Exxon Rsch. & Eng'g Co. v. NLRB*, 89 F.3d 228 (5th Cir. 1996) ..............50, 55

*FDRLST Media, LLC v. NLRB*, 35 F.4th 108 (3d Cir. 2022) ..............45, 46, 51

*Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203 (1964) ....................65

*Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) ..................64

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)......................65

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)..............61

*Hendrickson USA, LLC v. NLRB*, 932 F.3d 465 (6th Cir. 2019).........45, 47, 49

*In re Medic One, Inc.*, 331 NLRB 464 (2000)................................48

*In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707 (5th Cir. 2018)......................27

*Int'l Union of Operating Eng'rs v. NLRB*,
    127 F.4th 58 (9th Cir. 2025)......................................62, 64, 65

*J.J. Newberry Co. v. NLRB*, 442 F.2d 897 (2d Cir. 1971) ....................47

*Jupiter Med. Ctr. Pavilion*, 346 NLRB 650 (2006) ..........................54

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000)............................38

Page

Cases—continued:

*Laidlaw Waste Sys., Inc.*, 307 NLRB 52 (1992)..................................................48

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................26

*Lord & Taylor v. NLRB*, 703 F.2d 163 (5th Cir. 1983) .......................................58

*Macy's, Inc. v. NLRB*, 824 F.3d 557 (5th Cir. 2016)..........................................1

*Merck, Sharp & Dohme Corp.*,
   367 NLRB No. 122, slip op. (May 7, 2019).......................................47

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) .......................................61

*NLRB v. AllService Plumbing & Maint., Inc.*,
   --- F.4th ----, 2025 WL 1482496 (5th Cir. May 23, 2025)......................*passim*

*NLRB v. Ambox, Inc.*, 357 F.2d 138 (5th Cir. 1966)....................................57, 59

*NLRB v. Arkema, Inc.*, 710 F.3d 308 (5th Cir. 2013) ............................*passim*

*NLRB v. Cosco Prods. Co.*, 280 F.2d 905 (5th Cir. 1960) ............................42

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) ............................45

*NLRB v. Instrument Corp. of Am.*, 714 F.2d 324 (4th Cir. 1983)....................32

*NLRB v. Kiawah Island Co.*, 650 F.2d 485 (4th Cir. 1981) ............................32

*NLRB v. Starbucks Corp.*, 125 F.4th 78 (3d Cir. 2024) ......................62, 63, 64

*Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325 (2018).........66

*Pioneer Nat. Gas Co. v. NLRB*, 662 F.2d 408 (5th Cir. 1981) ....................55, 57

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) ............................64

*Remington Lodging & Hosp., LLC v. NLRB*,
   847 F.3d 180 (5th Cir. 2017)............................29

*Renew Home Health v. NLRB*, 95 F.4th 231 (5th Cir. 2024) ...............36, 44, 56

*Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106 (D.C. Cir. 2002).....................29, 40

*Scott v. Univ. of Miss.*, 148 F.3d 493 (5th Cir. 1998) ............................38

*Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493 (7th Cir. 2003)..............30, 32, 33

*SEC v. Jarkesy*, 603 U.S. 109 (2024)............................66

*Shamrock Foods Co. v. NLRB*, 346 F.3d 1130 (D.C. Cir. 2003).....................28

*Shell Oil Co.*, 77 NLRB 1306 (1946) ............................47

*Snyder v. Phelps*, 562 U.S. 443 (2011) ............................26

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ................62

*Stern Produce Co. v. NLRB*, 97 F.4th 1 (D.C. Cir. 2024) ........................37, 38

*Stern v. Marshall*, 564 U.S. 462 (2011)............................65, 66

*Tellepsen Pipeline Servs. Co. v. NLRB*,
   320 F.3d 554 (5th Cir. 2003)............................28, 29, 30

Page

Cases—continued:

*Tex. World Serv. Co. v. NLRB*, 928 F.2d 1426 (5th Cir. 1991) ........................27
*Thryv, Inc.*, 372 NLRB No. 22, slip op. (Dec. 13, 2022) ........................*passim*
*Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024) ....................................61, 63
*Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880 (8th Cir. 2018)....................28
*UAW v. NLRB*, 834 F.2d 816 (9th Cir. 1987) ..............................................46
*UNF W., Inc. v. NLRB*, 844 F.3d 451 (5th Cir. 2016) ..........................26, 45, 53
*UNF W., Inc.*, 363 NLRB 886 (2016) ..........................................................53
*United States v. Burke*, 504 U.S. 229 (1992)................................................64
*Vision of Elk River, Inc.*, 361 NLRB 1395 (2014)........................................33
*Vulcan Basement Waterproofing of Ill., Inc. v. NLRB*,
    219 F.3d 677 (7th Cir. 2000)................................................................28
*Wellstream Corp.*, 313 NLRB 698 (1994)....................................................53
*Wright Line*, 251 NLRB 1083 (1980)....................................................*passim*

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const.
    art. III ................................................................................5, 25, 65
    amend. I ................................................................................*passim*
    amend. VII................................................................5, 25, 65, 66
29 U.S.C.
    § 158 ................................................................................28, 44, 45, 47
    § 160 ................................................................................*passim*
    § 187 ................................................................................64
    § 2617 ................................................................................64
29 C.F.R. §§ 101.10-.12 ................................................................18

## OTHER AUTHORITIES

Samuel L. Bray, *The System of Equitable Remedies*,
    63 UCLA L. Rev. 530 (2016)................................................................63
Dan B. Dobbs, 1 Law of Remedies (2d ed. 1993) ..............................................64
NLRB, *Casehandling Manual, Part 3, Compliance Proceedings*
    (Oct. 19, 2020), https://tinyurl.com/ycketcuj................................................63
Howard Schultz, *Statement Before the Senate Committee on Health,*
    *Education, Labor, and Pensions* (Mar. 29, 2023),
    https://tinyurl.com/ydh7phk7 ................................................................5, 6

Page

Other Authorities—continued:

*Starbucks Raises the Bar with Industry-Leading Employee Benefits, Outperforming Competitors* (Nov. 6, 2023),
https://tinyurl.com/43m6v2r2 ...........................................................................5

## JURISDICTIONAL STATEMENT

The National Labor Relations Board (NLRB or Board) issued its Decision and Order on December 16, 2024. Starbucks filed a petition for review on December 24, 2024. The Board cross-applied for enforcement on January 22, 2025. This Court has jurisdiction because the Board's Decision is a final order, and venue is proper here because Starbucks transacts business within this Circuit. *See* 29 U.S.C. § 160(e), (f); *Macy's, Inc. v. NLRB*, 824 F.3d 557, 561 n.1 (5th Cir. 2016). The petition and cross-application are timely because the National Labor Relations Act (NLRA) imposes no time limit for such filings. *See, e.g.*, *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001).

## STATEMENT OF THE ISSUES

1.    Whether the Board erred in holding that Starbucks unlawfully terminated an employee for union activity under NLRA Sections 8(a)(3) and 8(a)(1), notwithstanding that the employee had a history of repeated disciplinary problems and the employee's termination was in process before the union activity occurred.

2.    Whether the Board erred in holding, in contravention of the First Amendment and Section 8(c), that Starbucks violated Section 8(a)(1) when

supervisors expressed their opinions regarding unionization and its possible effects, unaccompanied by threats of reprisal.

3.     Whether the Board erred in holding that Starbucks conducted a coercive interrogation in violation of Section 8(a)(1) when a store manager asked an employee "how [he] felt about unionization."

4.     Whether the Board erred in ordering a second union election.

5.     Whether the Board exceeded its statutory authority and violated Article III and the Seventh Amendment in ordering compensatory damages.

## INTRODUCTION

The NLRA does not endow union organizers with uber protection from discipline or discharge.  The NLRA prohibits employers from disciplining or discharging employees *because of* their union activity, not for failing to do their jobs.  Starbucks barista Jason Untaran repeatedly violated company policies and shirked his duties.  He vaped inside the Sylmar, California store where he worked, even blowing smoke close to a supervisor's face.  He repeatedly showed up late.  He jeopardized customer health.  And he failed to complete his closing tasks, admittedly telling a supervisor that the morning crew could handle that "shit."   Untaran's supervisors gave him multiple chances to

improve.  After continued violations, Starbucks did the responsible thing and terminated his employment.

Below, the NLRB administrative law judge (ALJ) abandoned common sense and concluded that anti-union animus motivated Starbucks' termination of Untaran's employment.  But there was not one shred of *evidence* that the managers who terminated Untaran's employment were motivated by animus.  Instead, the ALJ inferred animus from the fact that the discharge happened four days after Untaran engaged in union activity in the store.  The ALJ ignored evidence that the discharge was already in process and a response to Untaran's repeated job failings.  The ALJ also derived animus from his (incorrect) finding that the discipline Untaran received did not perfectly match that of two other employees.  If that were evidence of anti-union animus, no employer could implement flexible disciplinary policies.  The ALJ's conclusion that Starbucks unlawfully discharged Untaran (adopted by the Board) is entirely unsupported.

The Board also found that Starbucks' managers interfered with employees' organizing rights, in violation of NLRA Section 8(a)(1), in conversations with employees.  Section 8(c) protects employers' First Amendment right to discuss unionization—and even advocate against

unionization—with employees. As relevant here, employer speech violates the NLRA only when it threatens "reprisal"—that is, threatens to retaliate against employees because of their union activity.

This Court has eschewed per se rules when it comes to employer speech and questions about unionization. In the decision below, however, the Board enforced arbitrary distinctions between permitted and prohibited speech, turning Section 8(a)(1) into an employer-speech policing mechanism. Among other things, it faulted a manager for saying that some benefits could be lost in bargaining because she referenced "negotiations" but did not specifically state that bargaining involves a "give and take." It faulted a manager for explaining that employers may extend new benefits to nonunionized employees while it bargains with unionized ones—a correct statement of the law. And it faulted a manager for simply asking an employee how he felt about unionizing—contrary to this Circuit's precedent.

The Court should deny enforcement in toto. At a minimum, the Court should deny enforcement as to two remedies. First, the Board ordered Starbucks to hold a new union election even though a supermajority of Sylmar employees voted against unionization. Because this order rested on the

erroneous conclusion that Starbucks wrongfully discharged Untaran, the Court should vacate the new-election remedy.

Second, the Board ordered Starbucks to compensate Untaran for all "direct or foreseeable pecuniary harms." As the Third Circuit has held, the Board lacks statutory authority to order compensatory damages. Section 10(c) confines the Board to *equitable* relief. Compensatory damages are quintessential *legal* relief. The Board's contrary view would violate Article III and the Seventh Amendment.

## STATEMENT OF THE CASE

### A.     Factual History

1. Starbucks is the world's largest coffee purveyor. The secret to Starbucks' success is not corporate strategy—it is the baristas. Within the United States, Starbucks employs some 235,000 people, whom it considers "partners." *Starbucks Raises the Bar with Industry-Leading Employee Benefits, Outperforming Competitors* (Nov. 6, 2023), https://tinyurl.com/43m6v2r2. Starbucks offers partners highly competitive pay, with total compensation for baristas at approximately $27 per hour. *Id.* It offers 401(k) benefits and comprehensive healthcare. Howard Schultz, *Statement Before the Senate Committee on Health, Education, Labor, and*

*Pensions* 2 (Mar. 29, 2023), https://tinyurl.com/ydh7phk7.  And it pays up to 100% of baristas' college tuition via a partnership with Arizona State University.  *Id.*

To maintain its people-first approach, Starbucks sets high standards for partners.  These policies—contained in the Partner Guide—require partners to treat other partners with respect.  ROA.297.  Under Starbucks' "How We Communicate" policy, partners must "communicate with other partners … in a professional and respectful manner at all times," in part by avoiding "vulgar or profane language."  RE10; ROA.638.  Starbucks' policies also indicate that "[a] partner's reliability in reporting to work when scheduled and on time is essential."  RE10; ROA.642.  Starbucks prohibits using tobacco products, including vaping, in its stores.  RE10; ROA.640.  And Starbucks' "Mission and Values Statement" makes clear that partners should aim to deliver the best in what they do and understand the impact of their behavior on others.  RE10; ROA.654.

Starbucks shares these policies with each partner on their first day.  ROA.297-298.  Starbucks does not, however, have a rigid progressive discipline policy.  Instead, managers impose varying levels of discipline depending on the circumstances.  ROA.423-425.  In some cases, a manager

may intervene with a "coaching conversation"—an informal discussion identifying the problem and reviewing the relevant policy. ROA.422. In other instances, managers may elect "documented coachings"—conversations written into a partner's personnel file. ROA.468. Other times, managers might use "written warnings" or "final written warnings." *See* ROA.468. Failure to abide by Starbucks' policies—especially after a final written warning—can result in separation. ROA.322-323.

2. The relevant events occurred in a Starbucks store in Sylmar, California. The Sylmar store has a lobby, coffee bar, and tables. RE8. There is also a partner-only area, known as the "back of the house," where partners may take breaks or grab supplies. RE8.

Tiffany Fuller has served as store manager since August 2021. RE8. Jennifer Tayarah is the local district manager. RE8. She interfaces with Fuller regarding disciplinary matters. ROA.341. During the relevant period, partners Ruby Castro and Amanda Rendon were shift supervisors. RE8.

Sylmar partners worked one of three shifts: morning, midmorning, and closing. RE8. Typically, three partners—a shift supervisor and two baristas—staffed the closing shift. RE8. The shift supervisor would assign duties like mopping floors, cleaning bathrooms, sanitizing equipment, and

restocking supplies.  RE8.  The goal of every closing was to ensure the store would be cleaned, stocked, and ready for the next day.  RE8.  If the closing-shift partners failed to complete their duties, the tasks fell to the morning shift.  ROA.41.

3.  Jason Untaran began working as a barista at Sylmar in June 2021.  RE11.  He previously had worked at other Starbucks locations off and on.  RE11; ROA.195-196.  At Sylmar, Untaran usually worked closing shifts.  ROA.196.  Roughly eight months into his employment, store manager Fuller began receiving reports of progressively serious problems with Untaran's behavior.

The first incidents occurred in February 2022.  On February 20, Untaran arrived for his assigned shift more than 30 minutes late.  ROA.586; RE11.  The next week, on February 27, he was late again.  ROA.586; RE11.  Responding to shift-supervisor complaints, Fuller met with Untaran and issued a documented coaching.  ROA.586.  Untaran did not dispute his tardiness.  ROA.239.

A few weeks later, Fuller received more complaints.  After closing on March 26, Castro watched Untaran start vaping in the store, violating Starbucks' non-smoking policy.  ROA.255, 398, 589.  Castro testified that when

she confronted him, Untaran told her that "nobody was watching the cameras so it didn't matter." ROA.398.

The next day, Castro was eating lunch in the back of the house. Untaran sat down next to her and started vaping. ROA.398-399, 589; RE11. Untaran got close enough that smoke drifted "all over" Castro, including "into her face." RE11; ROA.399. Castro later testified that when she objected, Untaran replied that "nobody was … actually watching so it didn't matter." ROA.399. Castro reported the incident to Fuller, who reported it to Tayarah. ROA.321, 399.

Violating Starbucks' smoking policy can result in immediate separation. ROA.323. But Tayarah and Fuller decided to issue Untaran a final written warning instead. ROA.324. The warning was delivered on March 28, 2022. ROA.589. Untaran did not dispute that he vaped but claimed he did not blow smoke "specifically" into another partner's face. ROA.222-223.

4. In May 2022, after Untaran's final written warning, Sylmar partner David Ramirez posted a letter on social media formally requesting an election on union representation. RE8-9. Signatories identified themselves as the Starbucks Workers United Organization Committee. RE9. The Committee included Ramirez, another partner named Barbara Pichardo Banegas

(Pichardo), two other named partners, and anonymous partners. RE8-9. The letter did not name Untaran. *See* RE8-9. On May 18, 2022, the union petitioned for an election to represent the store's baristas, shift supervisors, and assistant managers. RE9.

The petition coincided with national-level developments. On May 3, 2022, Starbucks announced that it planned to increase pay and benefits nationwide beginning August 1, 2022. ROA.607; RE9. On June 14, 2022, Starbucks released a follow-up notice clarifying that, pursuant to federal law, Starbucks could not unilaterally alter terms and conditions of employment—including by increasing pay or benefits—in stores with a designated union representative or undergoing a union election. ROA.607; RE9. The notice indicated that, in general, the pay and benefit increase would be limited to stores where no union activity had occurred on or before May 3, 2022. ROA.607.

Fuller posted the notice. ROA.442. Ramirez asked Fuller and Tayarah whether partners at Sylmar would receive the new August 1 benefits, given the imminent union election. ROA.442, 609-610. Fuller and Tayarah responded that, at that point, they did not know. ROA.312-313, 442.

5.    After the petition, Fuller and Tayarah conducted one-on-one meetings with partners.  ROA.300.  Several impromptu statements by Fuller and Tayarah are at issue in this case.

**Statements to Edison Sosa.**  In a meeting with barista Edison Sosa, ROA.276, 281, Fuller shared information about the election process and asked whether Sosa had questions, ROA.277.  Sosa asked Fuller to explain, in her view, "what … [it] mean[s] for us … if we were to unionize?"  ROA.277.  Fuller responded that, because the store was "going through this [union election] process right now," the national-level benefits change Starbucks had announced "would be put on pause for us" during the election.  ROA.280-281, 286.  If the union won, those benefits "would be either added on, or not, based on if the Union representative would argue for that."  ROA.283, 286.

**Statements to Ramirez and Untaran.**  In June 2022, Fuller also met with Ramirez.  ROA.63-64.  Ramirez asked Fuller for "her personal views" on unionizing.  ROA.65.  Fuller responded that she was generally in favor of unions and that her father had benefitted from union-obtained benefits.  ROA.65, 434.  But she was not in favor of unionizing at Sylmar "because of the risks that she believed that we would lose benefits if we were to unionize."  ROA.65.  Fuller mentioned the tuition benefit and some healthcare benefits as

perks that "we could lose through negotiations." ROA.66. She also referenced a Starbucks store in Canada whose union had agreed to less desirable benefits than nearby stores. ROA.66.

Later, on June 22, Fuller met with Untaran in the back of the house to tell him about the union petition. ROA.204-207. No evidence showed that Fuller, Tayarah, or Starbucks knew about Untaran's union activities or sympathies before then. RE11. Fuller asked Untaran how he felt about unionization. ROA.205. Untaran remarked that, in his view, if the store had a larger staff, unionizing would not be necessary. ROA.205-206.

Fuller responded that, "even if the union did get voted in, it wasn't … a guarantee that they could … give us extra hours to have someone else on the floor." ROA.207. She then predicted that certain benefits, like the tuition benefit, "were possibly going to be withheld … during the negotiations for contracts with Starbucks and the Union," and observed that negotiations can sometimes last "up to a year." ROA.207. As with Ramirez, Fuller discussed a unionized Starbucks store in Canada that received pay and benefits that were "not worth it after a year of negotiation." ROA.207.

**Statements to Pichardo.** In a July 2022 conversation with Fuller and Tayarah, Pichardo asked for their views on unionization and explained she

wanted better pay and working conditions.    ROA.174, 177, 437.    Fuller expressed her support for unionization generally, noting that her father worked at an Amazon warehouse and that unionization was appropriate there to correct bad working conditions.    ROA.178.    Fuller said she did not believe that unionizing was desirable at Sylmar.    ROA.178-179.

Tayarah agreed with Fuller's views on unionization at Amazon, but said she was not in favor of unionization at Sylmar.    ROA.179.    Tayarah told Pichardo that in her opinion, "unionizing the store wouldn't change the world" or "change better working conditions."    ROA.177.    Tayarah said that Starbucks already "offered competitive pay, good benefits, and great working conditions."    RE10.    But Tayarah admitted that "there are other jobs that do offer better pay."    ROA.178.

6.    During this same period—both before and after the union petition—Untaran's work performance continued to deteriorate.

One of Untaran's assigned tasks was to clean the floor drains with bleach.    ROA.202, 240-241.    On May 30, 2022, Fuller had to intervene and instruct Untaran not to clean the floor drains in the sink where customer drinks were prepared, but instead to use the sink in the back of the house.

ROA.202.    Untaran later admitted that he received verbal coaching from Fuller about the drains on May 30.  ROA.201-202.

Shift supervisors are *non-management* partners who were part of the collective bargaining unit proposed by the election petition.  ROA.579.  Shift supervisors Castro and Rendon contemporaneously reported and documented more problems with Untaran's performance, *before* Untaran's June 22 meeting with Fuller when he first disclosed his union leanings.  Following a shift on June 4, 2022, for instance, Castro approached Fuller about difficulties she experienced with Untaran.  ROA.390-391.  Fuller contacted Tayarah around June 5 to alert her to the problems Castro had reported.  ROA.326.  Fuller instructed Castro to send her an email so Fuller could "remember … what [Castro] had discussed with her."  ROA.393.

Castro wrote an email to Fuller dated June 9, 2022.  ROA.661.  Castro recounted that Untaran usually resisted requests to refill the ice or help with restocking tasks.  ROA.661.  Untaran suggested they should let "the openers do it [because] they don't do s*** in the morning."  ROA.394, 397, 661.  Untaran also "wasn't cleaning the bathrooms correctly because he said he has a thing about germs."  ROA.661.  Castro reported that Untaran "almost never cleans the tables" after being asked.  ROA.661.  And Castro noted that,

14

although Untaran "does a better job when I specifically ask him to do things a certain way," she felt she "shouldn't have to be on him [about] every task and tell him what needs to be done every night." ROA.661.

Another shift supervisor, Rendon, offered a similar account. As Untaran acknowledged, on June 12, Rendon and Untaran were working the closing shift. ROA.208. Untaran did not finish his closing tasks. ROA.210. Untaran later admitted that he told Rendon and other partners in the front of the house that "whatever things that, like needed to be done that we can't take care of, they can do that shit in the morning." ROA.210. Rendon reported the incident to Fuller. ROA.376-377.

Around June 13, Untaran met with Fuller. ROA.211, 455. Fuller told him that another team member had complained about his comments "about the morning group," adding that he "should be more mindful about [his] comments." ROA.212-213. Untaran understood the complaining team member to be Rendon. ROA.213, 248.

A few days later, on June 15, Rendon submitted a written statement to Fuller memorializing her complaints. ROA.659. She referenced Untaran's comments about leaving evening tasks for the morning crew. ROA.659. Like Castro, Rendon reported that Untaran "ignor[ed] his shift lead['s] requests to

do tasks"—for example, by "removing parts of the drain & then bring[ing] them back without actually cleaning the[m]." ROA.659. Rendon further explained that Untaran failed to load toilet paper rolls into the bathroom dispenser, even after being coached to do so. ROA.659. And she noted that Untaran's comments about leaving tasks for the morning crew were beginning to prompt similar comments from other partners. ROA.659.

7. On June 28, Ramirez coordinated a meeting in the store lobby with a congressman. RE9. Ramirez, Untaran, Pichardo, and one other partner attended wearing Workers United shirts. RE9. Fuller was working at the coffee bar during the meeting. ROA.79-80, 168. The following day, the congressman posted photos of the meeting online, and Ramirez sent the post to Tayarah. ROA.81-82, 619, 629.

8. As previously mentioned, beginning around June 5, 2022, Fuller had alerted Tayarah to the problems with Untaran's behavior. ROA.325-326; RE12. Fuller shared with Tayarah what she learned from Castro and Rendon and gave Tayarah their written statements. ROA.327-328, 659, 661. During follow-up conversations with Tayarah over two or three weeks, ROA.327, Fuller determined that Untaran's conduct merited separation, particularly given his pre-petition final written warning, ROA.220, 328. Tayarah agreed

this would likely be the next level of discipline approved by human resources. ROA.328. Before acting, Fuller and Tayarah presented the information and statements from Castro and Rendon to Partner Resources, Starbucks' human resources department. ROA.220, 327-328.

On July 1, 2022, Tayarah called Untaran to the back of the house, where she and Fuller told him Starbucks was terminating his employment. ROA.218-220, 591. Fuller explained that she had already given Untaran a warning, and that because of his numerous subsequent infractions "at this point in time, because you've been on a final for another violation, we are moving to separation." ROA.329. At the hearing, Untaran summarized Fuller as saying that Untaran "already had a final warning, and we can't have a final on a final, so we're letting you go." ROA.220. Tayarah explained that the decision had been "vetted with Partner Resources and legal," ROA.329, as Untaran acknowledged at the hearing, *see* ROA.225.

The separation notice indicated that Untaran's discharge arose from violating Starbucks' policies that partners "treat[] everyone with dignity and respect," and its How We Communicate policy requiring partners to "communicate … in a professional and respectful manner" and refrain from "vulgar or profane language." ROA.591. The notice documented Untaran's

behavioral problems over the preceding months.  ROA.591; *supra* pp.8-9, 13-16.  The notice also documented Untaran's comment to Castro that morning partners "don't do shit," and his conversation with Fuller on June 13, in which he admitted to using foul language.  ROA.591; *supra* p.15.  The notice added that Untaran had received a final written warning for violating Starbucks' tobacco policy.  ROA.591.

9.  In the July 2022 election, seven out of approximately 27 eligible partners voted for the union.  RE9.  Fifteen partners—a supermajority—voted against.  RE9.

### B.    Procedural History

1.  The union filed objections to conduct it claimed affected the election results.  ROA.515-517.  Separately, the union filed unfair labor practice charges related to Untaran's termination and statements by Fuller and Tayarah.  ROA.548, 571.  The cases were consolidated, and the Regional Director issued a complaint on the unfair labor practice charges.  ROA.513-514; *see generally* 29 U.S.C. § 160(b), (c); 29 C.F.R. §§ 101.10-.12.

2.  After a three-day hearing, an administrative law judge (ALJ) found against Starbucks on four charges.  RE7.

**Conversation with Pichardo.** The ALJ concluded that during Fuller's and Tayarah's conversation with Pichardo, Starbucks committed two violations of NLRA Section 8(a)(1). RE14-15. First, he concluded that Tayarah's statement that unionization "wouldn't change the world" or "change better working conditions," ROA.177, "was tantamount to stating that the employees' selection of union representation would be futile," RE15. Second, the ALJ found that Tayarah's remark that "there are other jobs that do offer better pay," ROA.178, unlawfully "implied that support for the union was incompatible with continued employment," RE14-15.

**Conversation with Sosa.** Next, the ALJ concluded that Fuller's statement to Sosa that the national-level benefits changes "would be put on hold" during the election "was an unlawful threat" and violated Section 8(a)(1). RE15.

**Untaran Termination.** The ALJ also found that Untaran's termination violated NLRA Sections 8(a)(3) and 8(a)(1). Applying the framework from *Wright Line*, 251 NLRB 1083 (1980), the ALJ concluded that the General Counsel had satisfied its initial burden of demonstrating that Untaran's termination was motivated in part by Starbucks' animus toward Untaran's pro-union activity. RE15. According to the ALJ, animus could be "inferred"

by the timing of Untaran's discharge—"four days after he met with the Congressman"—and by the "more lenient way" Starbucks had allegedly disciplined other partners.  RE15.

Next, the ALJ held that Starbucks failed to demonstrate it would have terminated Untaran absent his union activity.  RE16.  In so doing, the ALJ refused to credit any aspect of Castro's or Rendon's accounts—including their contemporaneous written statements that predated any knowledge of Untaran's union sympathies—beyond what Untaran himself had admitted. RE13; RE16.

4.  The ALJ ordered Starbucks to reinstate Untaran to his prior position or a substantially equivalent one and provide back pay.  RE17.  Citing *Thryv, Inc.*, 372 NLRB No. 22 (Dec. 13, 2022), the ALJ further ordered that Starbucks compensate Untaran "for any other direct or foreseeable pecuniary harms incurred as a result of its unlawful conduct."  RE18.  The ALJ also concluded that Starbucks' "objectionable conduct" required a new election. RE17; RE18.

5.  Starbucks and the General Counsel filed exceptions.  On December 16, 2024, the Board issued a decision.  RE1.

The Board first adopted the ALJ's conclusions that Starbucks committed unfair labor practices when (1) Fuller told Sosa that companywide benefits would be "on pause" during the election; (2) Tayarah told Pichardo the union "would not bring better working conditions"; and (3) Tayarah told Pichardo "there were other jobs at other companies that offered better pay." RE2. Additionally, the Board adopted the ALJ's conclusion that Starbucks unlawfully terminated Untaran "in response to his union activity." RE2.

Reversing the ALJ, the Board concluded that (1) Fuller issued "unlawful threats of a loss of benefits" when she shared her views on unionization with Ramirez and Untaran, and (2) Fuller's conversation with Untaran about unionization on June 22 was a "coercive interrogation." RE2-4.

The Board adopted the ALJ's remedies. RE5-6.

## SUMMARY OF ARGUMENT

I.    The NLRA is not a get-out-of-jail-free card for union organizers. Employers may discipline and discharge union organizers; the NLRA only prohibits doing so because of union activity. Under the *Wright Line* framework, the General Counsel bears the burden to prove a discharge was motivated by anti-union animus. If the General Counsel makes that showing,

an employer still may avoid liability by showing it would have discharged the employee anyway.

The record forecloses a conclusion that Starbucks unlawfully discharged Untaran. Starbucks discharged Untaran after a series of incidents to which Untaran admitted: he was repeatedly late, he vaped in the store, he jeopardized customer health, and he used profanity in telling supervisors he was pushing tasks onto the morning crew. The record contains no evidence whatsoever of anti-union animus. The ALJ *inferred* animus from the flimsiest of reasons. First, he inferred animus because the discharge occurred four days after Untaran openly engaged in union activity. But the ALJ simply ignored undisputed evidence that the discharge was already in process. Second, the ALJ inferred animus on the purported ground that Starbucks disciplined Untaran more harshly than two other partners. But the ALJ misunderstood the relevant facts. And inferring animus from the circumstances of just two employees unfairly penalizes employers with flexible disciplinary policies.

For many of the same reasons, the ALJ erred in concluding that Starbucks did not prove it would have discharged Untaran anyway. At this step, the ALJ also erred by refusing to credit as "contrived and instigated by

management" the contemporaneous accounts of Starbucks' *non-management* shift supervisors—even though those accounts predated any knowledge of Untaran's union sympathies.

II.     The Board further erred in holding that Fuller and Tayarah interfered with employees' organizing rights in their conversations with Sosa, Ramirez, Untaran, and Pichardo.  The First Amendment and NLRA Section 8(c) protect and encourage vigorous debate among employers and employees about unionization.  Under Section 8(c), employers may express their views about unionization and predict its effects on the workplace so long as they do not threaten employees with reprisal—*i.e.*, punish them for organizing.  Fuller and Tayarah never threatened reprisal.

A.     Fuller told Sosa that a recently announced pay raise would be "on pause" during the election.  That statement correctly articulates the legal principle that employers may withhold new benefits from unionizing employees during elections and bargaining.  Fuller did not threaten to withhold benefits from employees because of unionizing; to the contrary, she accurately explained that whether unionized employees would receive the pay increase would depend on the bargaining process.

B.     Even the ALJ understood that Fuller did not threaten Ramirez and Untaran.   As courts have recognized, employers lawfully may tell employees that the bargaining process could result in a loss of benefits.  Fuller appropriately conveyed this fact to Ramirez.  And, as with Sosa, Fuller simply explained to Untaran that benefits like the recently announced pay raise would be withheld during bargaining.

C.     As this Court has held, statements opining that unionization will be futile are not per se unlawful.  To violate Section 8(a)(1), an employer must threaten that the employer will take action to render unionization futile.  The ALJ did not apply this standard.  Tayarah never threatened Pichardo that Starbucks would render unionization futile.  Nor did Tayarah threaten Pichardo when she said there are "other jobs that offered better pay."  The ALJ improperly treated any statement about better pay elsewhere as categorically threatening discharge.

III.   The Board overreached in holding—in disagreement with the ALJ—that Fuller coercively interrogated Untaran when she asked him how he felt about unionization.  If that innocuous question is off limits, then employers can never ask employees questions about unionization—a proposition this Court has rejected.  This Court has repeatedly found similar

24

questions too generic to coerce employees. Each of the relevant factors weighs in favor of Starbucks: there was no history of coercion at the store, the question was not threatening, Fuller was a low-level supervisor, the exchange was friendly, and Untaran answered truthfully.

IV.   Although the Court should deny enforcement in toto, at a minimum it should deny enforcement as to two remedies. First, based on Untaran's discharge, the ALJ ordered Starbucks to hold a new election at the Sylmar store. Because the discharge did not violate the NLRA, the new election remedy cannot stand.

Second, the Board instructed Starbucks to pay Untaran for all "direct or foreseeable pecuniary harms" resulting from his termination. That remedy amounts to compensatory damages. But NLRA Section 10(c) only authorizes the Board to order employers to cease unfair labor practices and take "affirmative action … as will effectuate the policies of" the NLRA. As the Third Circuit has held, that language limits the Board to traditional *equitable* remedies; it does not authorize *legal* remedies like compensatory damages. Reading Section 10(c) to allow compensatory damages would infringe Article III and the Seventh Amendment, which require federal courts and juries to adjudicate cases involving private rights.

## STANDARD OF REVIEW

This Court reviews the NLRB's legal conclusions de novo. *UNF W., Inc. v. NLRB*, 844 F.3d 451, 457 (5th Cir. 2016); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403-05 (2024).   Whether the First Amendment protects particular speech is a legal question that requires this Court to "conduct[] an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984); *accord Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

The Court reviews the Board's factual findings for substantial evidence, based on "the record considered as a whole." *Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013) (quoting 29 U.S.C. § 160(e)).   "[A] flawed reading of the record provides no substantial evidence for a finding." *Dish Network Corp. v. NLRB*, 953 F.3d 370, 376 (5th Cir. 2020).   This Court must reject the Board's order where it "fails to grapple with countervailing portions of the record." *NLRB v. AllService Plumbing & Maint., Inc.*, --- F.4th ----, 2025 WL 1482496, at *6 (5th Cir. May 23, 2025) (cleaned up).   Evidence supporting the agency's conclusions "must be *substantial*, not speculative, nor derived from

inferences upon inferences." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 639 (5th Cir. 2003).

Where the Board affirms and adopts an ALJ's findings and conclusions, courts apply these same standards to the ALJ's decision. *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018). But when the Board reverses the ALJ, this Court "examines the evidence and findings of the Board more critically than it would have done had the Board agreed with the ALJ." *Tex. World Serv. Co. v. NLRB*, 928 F.2d 1426, 1430 (5th Cir. 1991).

## ARGUMENT

## I.    THE BOARD ERRED IN CONCLUDING THAT STARBUCKS TERMINATED UNTARAN'S EMPLOYMENT FOR UNION ACTIVITY

The Board erred in adopting the ALJ's conclusion that Starbucks violated Sections 8(a)(3) and 8(a)(1) when it terminated Untaran's employment. The ALJ's analysis ignored a mountain of evidence that Starbucks terminated Untaran's employment because of his myriad performance problems, not animus toward his union activity. If allowed to stand, the decision below will straightjacket employers anytime union activity is afoot, no matter how bad the employee's performance. The NLRA demands no such thing.

### A. The NLRA Prohibits Discharges Only When Based on Animus Toward Union Activity

Alongside Section 8(a)(1)'s prohibition on interference with organizing rights, Section 8(a)(3) prohibits employers from discriminating "in regard to hire or tenure of employment … to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(c)(3). Neither provision "give[s] union adherents job tenure, even during union organizing campaigns." *Vulcan Basement Waterproofing of Ill., Inc. v. NLRB*, 219 F.3d 677, 690 (7th Cir. 2000) (citation omitted). Rather, "[e]mployers retain the right to discharge workers for any number of other reasons unrelated to the employee's union activities." *Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880, 884 (8th Cir. 2018) (citations omitted). Where a discharge involves conduct unconnected to union organizing on its face, as here, "the central question is whether the discharge was motivated by anti-union animus." *Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1135 (D.C. Cir. 2003); *see also Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 565 (5th Cir. 2003) (similar).

To make that assessment, courts and the Board apply a burden-shifting framework from *Wright Line*, 251 NLRB 1083, 1087 (1980). Under that framework, the General Counsel bears the initial burden of establishing that "anti-union animus directed toward the employee's activities was a substantial

28

factor in the adverse employment action." *Tellepsen Pipeline*, 320 F.3d at 565.

If the General Counsel makes that showing, "the burden then shifts to the

employer to show, by a preponderance of the evidence, that it would have

taken the adverse action regardless of any anti-union animus." *Remington*

*Lodging & Hosp., LLC v. NLRB*, 847 F.3d 180, 183 (5th Cir. 2017) (cleaned

up). The "weaker a prima facie case against an employer under *Wright Line*,

the easier for an employer to meet his burden … of proving that the

[employer's action] would have occurred regardless of protected activity."

*Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106, 1113 (D.C. Cir. 2002) (citation

omitted).

### B.   The ALJ's Animus Finding Lacks Substantial Evidence

At the first step, the ALJ erred in concluding that anti-union animus was

a substantial factor in Untaran's termination. When assessing whether an

employer acted with anti-union animus, this Court considers a "variety of

factors," including the "employer's explanation of its action," "the seriousness

of the alleged violation," and "the timing of the employer's action in

relationship to union activity." *Tellepsen Pipeline*, 320 F.3d at 565 (citation

omitted). Importantly, however, "timing alone … is not substantial evidence

that [an employer] was motivated by anti-union animus," *NLRB v. Arkema,*

*Inc.*, 710 F.3d 308, 323 (5th Cir. 2013), especially when a discharge "purportedly stems from a series of disciplinary incidents or warnings that predate the employee's union activities," *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 506 (7th Cir. 2003). Likewise, although "disparate treatment of the disciplined employee" can be relevant, *Tellepsen Pipeline*, 320 F.3d at 556, inferring animus on that basis is improper unless "the only difference between two differently treated employees is the illegitimate criteria at issue (i.e., union activity)," *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1408 (5th Cir. 1996).

1. The ALJ concluded anti-union animus was a substantial factor in Untaran's discharge because the discharge occurred "four days after" Untaran's participation in a pro-union meeting, and secondarily based on "the more lenient way" Starbucks allegedly disciplined other employees. RE15. But the ALJ "fail[ed] to grapple" with undisputed evidence that Starbucks' motivation was grounded in Untaran's repeated performance problems, which predated Untaran's union activity. *AllService*, 2025 WL 1482496, at *6 (citations omitted).

The ALJ agreed that Untaran violated Starbucks' attendance policy twice in February 2022, before the union campaign. RE16. The ALJ also agreed that Untaran twice violated Starbucks' tobacco policy a few weeks

later, including by vaping so close to another partner that the smoke drifted in

her face. RE11. The ALJ further agreed that, on May 30, 2022, Fuller had to

give Untaran the common-sense instruction not to clean the floor drains in the

same sink where customer drinks are prepared—along with other problems

with his performance. RE12; ROA.202-203. And the ALJ agreed that on June

13—less than three weeks before Untaran's termination—Fuller confronted

Untaran again and Untaran admitted to telling partners not to worry about

completing tasks because other partners could "do that shit." RE12; ROA.210.

Untaran's separation notice cited many of these infractions and more.

ROA.591.

All this evidence "fairly detracts" from the ALJ's inference that animus

was a substantial factor in Starbucks' decision to terminate Untaran.

*AllService*, 2025 WL 1482496, at *6 (citations omitted). Instead, it

demonstrates that Untaran's pattern of unprofessional and inconsiderate

behavior motivated Fuller and Tayarah. The ALJ did not analyze *any of this*

*evidence* when assessing whether the General Counsel met its initial burden,

instead relegating it to the second *Wright Line* step. *See* RE16. But whether

Starbucks would have terminated Untaran regardless of any (purported)

animus is a separate issue from whether the decision arose from animus at all.

This Court and others have long recognized that considering evidence of an employee's preexisting disciplinary problems is essential when determining the existence of anti-union animus, especially when an inference of animus depends on the timing of an adverse action. In *Arkema*, for instance, this Court cautioned that focusing on "timing alone" apart from an employee's disciplinary record would "swallow the burden and the entire purpose of the *Wright Line* analysis," by effectively ensuring that legitimate employee discipline "could never occur simultaneously with union activity." 710 F.3d at 323-24; *see also NLRB v. Kiawah Island Co.*, 650 F.2d 485, 491 (4th Cir. 1981); *NLRB v. Instrument Corp. of Am.*, 714 F.2d 324, 327-28, 330 (4th Cir. 1983). The Seventh Circuit went as far as to caution that where an employee's discharge "purportedly stems from a series of disciplinary incidents or warnings that predate the employee's union activities, the timing of that discharge rarely if ever constitutes substantial evidence of the employer's antiunion animus." *Sears*, 349 F.3d at 506.

Here, the ALJ did not even consider the undisputed evidence demonstrating that Untaran's preexisting performance problems motivated Starbucks' action. The ALJ's own factual findings demonstrated that Untaran had "a series of disciplinary incidents or warnings that predate[d] [his] union

32

activities." *Sears*, 349 F.3d at 506. The ALJ's failure to consider that evidence alone rendered the ALJ's conclusion infirm.

This failure is especially arresting, because the ALJ further agreed that Starbucks did not terminate or discipline any other partner who attended the June 28 meeting or who was associated with the union. RE15; *see also Arkema*, 710 F.3d at 323 (distinguishing an instance where an employer had "disenfranchised 25% of the employees eligible to vote—an overwhelming majority of whom were pro-union"). On this point, the ALJ asserted that "the fact that [Starbucks] took no action against Ramirez … or the others who attended the meeting … does not serve as evidence that the Company's actions against Untaran were not motivated by antiunion animus." RE15. But the cited authority states only that the General Counsel "need not prove that an employer discriminated against all union supporters to establish that it discriminated against some," *Vision of Elk River, Inc.*, 361 NLRB 1395, 1395 n.2 (2014), not that such evidence is *irrelevant*.

2. The ALJ also failed to consider other undisputed evidence regarding the timing of Untaran's discharge that "fairly detract[ed] from" his conclusions. *Dish Network*, 953 F.3d at 377 (citation omitted).

The ALJ acknowledged that Tayarah testified that, as early as June 5, she and Fuller began discussing how to deal with Untaran's performance problems.  RE12.  According to Tayarah, "follow up calls" between her and Fuller continued "within the matter of two or three weeks."  ROA.327.  The ALJ likewise acknowledged testimony that Tayarah and Fuller eventually presented a recommendation to terminate Untaran to Starbucks' Partner Resources Center, and that the Center approved the separation sometime later.  RE11-12; *see also* ROA.225, 327-328; *supra* p.17.

On its face, all this evidence shows that the timing of Untaran's discharge was not related to his union activity, but instead was the outgrowth of a weeks-long process culminating with permission from Partner Resources.  In *Arkema*, this Court observed that "a two-week gap" between confronting an employee over performance-related deficiencies and issuing a sanction based in part on those deficiencies is often evidence of "corporate disorganization" or bureaucracy, not proof of "animus-based discipline."  710 F.3d at 322.  The evidence about Starbucks' decision-making supported a similar inference.  The ALJ failed to "grapple with [these] countervailing portions of the record."  *Dish Network*, 953 F.3d at 377.

This failure cannot be chalked up to the ALJ's credibility findings. Although the ALJ deemed "some aspects" of Tayarah's and Fuller's testimony not credible, RE8, the ALJ did not apply that conclusion to their testimony about the pre-termination decision-making process. On the contrary, in a separate discussion, the ALJ at least partially credited Tayarah's and Fuller's testimony regarding their interactions with Partner Resources. *See* RE11 (stating that "[b]ased on [Fuller's] testimony and that of Tayarah, I have to assume that she checked with [the Partner Resource Center]" before disciplining another partner).

Additionally, what little the ALJ *did* say about Tayarah's and Fuller's testimony about the pre-termination process is baffling. The ALJ suggested in passing that Tayarah and Fuller "each testified that the other drafted [Untaran's] notice of separation." RE12. But the ALJ never explained how divergence on that single detail would taint Tayarah's and Fuller's entire testimony about the termination process. And regardless, the divergence was imaginary—Tayarah and Fuller agreed that Fuller drafted "most" if not all of the separation notice, while Tayarah merely "reviewed it." *Compare* ROA.324-325, *with* ROA.452.

35

Next, the ALJ noted that "Fuller gave Untaran only a verbal couching [sic] on June 13 for using improper language on June 12." RE12. But the ALJ failed to explain how that fact had any bearing on the credibility of Fuller's or Tayarah's testimony. If anything, Untaran's admission to Fuller on June 13 and Fuller's subsequent reprimand offer even more reason to believe that Fuller and Tayarah decided on separation before they became aware of Untaran's pro-union stance on June 22, and certainly before the June 28 meeting with the congressman. *See* ROA.325-328; RE15. The ALJ's failure to adequately explain or analyze this evidence undercuts the animus finding.

3. Similar problems plague the ALJ's inference of animus based on "the more lenient way" Starbucks allegedly disciplined other employees. RE15. Specifically, the ALJ pointed to one employee, AP, who had committed "six violations before she was discharged," and another, NQ, who received "only a written warning for insulting one coworker and committing a battery on another on the same day." RE15. The ALJ's one-sentence analysis is the antithesis of reasoned decision-making, rendering it inadequate from the get-go. *Renew Home Health v. NLRB*, 95 F.4th 231, 243 (5th Cir. 2024). But even reading between the lines, the ALJ came nowhere close to demonstrating that "the only difference between" these employees and Untaran was the latter's

"union activity." *Asarco*, 86 F.3d at 1408. These "two instances" are insufficient "to permit a reasonable inference that [Untaran] was singled out for especially harsh punishment." *Stern Produce Co. v. NLRB*, 97 F.4th 1, 15 (D.C. Cir. 2024).

Begin with NQ. On December 11, 2021, Fuller issued a written warning to NQ for loudly responding "I can tell" to another partner's comment about not visiting the dentist recently, and for commenting on another partner's loose skin and proceeding to "pull on the skin on his arm." ROA.663. The ALJ contended that Fuller's decision "only" to issue a written warning was inconsistent with Untaran's treatment. RE15. But NQ's actions did not contain the "aggravating factors present in [Untaran's] case." *Asarco*, 86 F.3d at 1409. Unlike NQ, Untaran's undisputed infractions involved not just isolated personal sleights, but repeated and open disrespect for both other partners *and* company policy. *See* RE11-12.

The ALJ's cursory reference to AP's disciplinary record fares no better. Three of AP's six warnings occurred before Fuller became store manager, and Fuller testified she was unaware of them. RE11. The ALJ "assum[ed]" Fuller learned about those prior warnings, RE11, but ALJs cannot infer animus based on "[m]ere suspicions," *Asarco*, 86 F.3d at 1408 (citation omitted).

The evidence regarding AP's three remaining infractions likewise contains no hint of disparate treatment. The ALJ believed that AP's treatment was indirect evidence of animus, apparently based on the ALJ's finding that Untaran was fired after just one final written warning but AP received two final written warnings before termination. RE11; *see* RE15 (offering a single sentence of analysis). That finding is incorrect: AP's disciplinary record contains just one final written warning. *See* ROA.684-691. In any event, given that Starbucks has a "loose progressive discipline policy," ROA.733, "the mere fact of different outcomes in different cases does not, without more, support a reasonable inference that something nefarious was afoot," *Stern Produce*, 97 F.4th at 15. Inferring animus from minor differences in discipline across employees would turn the Board into a "super-personnel department[]," prohibiting managers from tailoring general policies to specific situations. *See Scott v. Univ. of Miss.*, 148 F.3d 493, 509 (5th Cir. 1998) (citation omitted), *abrogated on other grounds by Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000). The NLRA requires no such thing.

If anything, evidence about AP's discipline only reenforces that animus was lacking here. In AP's case, as in Untaran's case, the notice of separation occurred several weeks after the infractions that set the process in motion,

further proving that the timing of Untaran's discharge was not out of the ordinary. ROA.327, 691. And in AP's case, as in Untaran's case, Fuller testified that she issued the separation only after she "partnered with [the] district manager" and had "meetings with HR." ROA.479-480.

### C. The ALJ's Finding that Starbucks Would Not Have Terminated Untaran's Employment Absent Animus Lacks Substantial Evidence

Because the ALJ lacked substantial evidence to support his conclusion at *Wright Line* step one, this Court should deny enforcement without proceeding further. *See, e.g.*, *Arkema*, 710 F.3d at 324. Regardless, the record establishes that Starbucks proved at the second step it would have terminated Untaran's employment regardless of his union activity.

1. Again, start with the undisputed record. The ALJ's findings summarized above establish repeated violations of company policy, conduct that threatened customer health, and profanity. *Supra* pp.30-31. The ALJ agreed—or at least did not dispute—that Fuller and Tayarah had several discussions about Untaran's performance issues leading up to the discharge, and consulted with Partner Resources, which approved the firing. *Supra* p.34. All of that was more than sufficient to demonstrate that Starbucks would have terminated Untaran's employment regardless of his union activity—especially

where, as here, the "prima facie case" against Starbucks was so weak. *Sasol*, 275 F.3d at 1113 (citation omitted).

To avoid that obvious conclusion, the ALJ engaged in misdirection. For instance, the ALJ found it "significant" that the record lacked evidence of disciplinary problems that Untaran may have had at other Starbucks stores. RE16. Discounting record evidence based on speculation about irrelevant facts is the very definition of mere "[s]uspicion" and "conjecture." *Dish Network*, 953 F.3d at 378 (citation omitted).

The ALJ also insisted that the evidence "does not support [Tayarah's and Fuller's] position that Untaran's discharge was mandated because he had a prior written warning," RE16, apparently referencing Fuller's statement that "we could not have a final on a final," RE12. But as the ALJ noted just a few lines later, Tayarah testified that "separation is not automatic after a final written warning," but instead "depend[s] on the violation." RE16. Read against the "record considered as a whole," 29 U.S.C. § 160(e), Fuller's comment to Untaran was merely an assertion that, given Untaran's repeated problems, issuing a second final warning was not an appropriate solution, ROA.329.

40

Likewise, the ALJ noted that Fuller allegedly "elevated" her June 13 verbal warning to a final written warning only "after [Untaran] engaged in open union activity"—a circumstance the ALJ deemed "suspicious." RE16. But "[s]uspicion … register[s] no weight on the substantial evidence scale." *Dish Network*, 953 F.3d at 377-78 (citation omitted). That is especially true here, given that the ALJ never engaged with Tayarah's and Fuller's testimony that discussions about Untaran's performance problems began long before learning of his pro-union stance. Here again, the failure to consider countervailing evidence renders the ALJ's decision infirm.

2. Beyond these errors, the ALJ also—improperly and quite literally— "ignored any evidence that did not fit [his] narrative," *AllService*, 2025 WL 1482496, at *7, by refusing to credit *any* of Castro's or Rendon's testimony or even their contemporaneous written statements beyond what Untaran admitted to, RE13. Although credibility determinations are entitled to some deference, this Court need not defer where the ALJ's choice was "unreasonable" or "based on inadequate reasons." *Denton Cnty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161, 167 (5th Cir. 2020) (citation omitted). Here, it was both.

Start with Castro.  On June 9—*nearly two weeks before Fuller or Tayarah knew about Untaran's union stance*—Castro sent an email to Fuller documenting Untaran's disciplinary problems.  ROA.661; RE12.  Despite that chronology, the ALJ refused to credit Castro's email, claiming it "str[uck]" him as "instigated by management … to bolster [the] case for [Untaran's] discharge."  RE16.  It defies belief that Fuller and Tayarah orchestrated Castro's written statement in order to fire Untaran for being pro-union weeks before they learned of Untaran's pro-union views.  The ALJ's unsupported "suspicion" does not suffice.  *NLRB v. Cosco Prods. Co.*, 280 F.2d 905, 910 (5th Cir. 1960).

The problems multiply from there.  The ALJ deemed Castro noncredible because she testified about two but not all of the problems she identified in her June 9 email and did not provide dates or how many times she discussed the problems with Untaran.  ROA.390; RE13.  But no one at the hearing specifically asked Castro about those problems.  Likewise, the ALJ concluded that Castro's testimony was "too lacking in details," RE13, even though Rendon independently corroborated Castro's report about Untaran regularly complaining and failing to mop the floor to standard, ROA.375-376.

None of these (or other) purported discrepancies rendered Castro noncredible, much less *wholly* so.

The ALJ's determinations as to Rendon's credibility were similarly slipshod.  For instance, the ALJ pointed to Rendon's testimony that she never saw Untaran "refuse" to complete a task, asserting this contradicted her testimony that he would perform tasks (like mopping) but did not follow her instructions on *how* to perform tasks.  RE13.  The ALJ further cited Rendon's written statement as contradictory, *id.*, but in it Rendon never claimed that Untaran "refused" shift-supervisor commands.  Rather, she said she had seen Untaran "ignore" requests by doing things like "remov[ing] parts of the drain & then bring them back without actually cleaning the[m]."  ROA.659.  Likewise, the ALJ deemed Rendon noncredible because Untaran did not receive any "written corrective action" for "the conduct to which Rendon testified."  RE13.  Yet in almost the same breath, the ALJ acknowledged that Untaran received "verbal counseling" from Fuller on June 13 for the statement about morning partners, and that Untaran himself apologized to Rendon for that incident.  RE12.  This Court should not defer to a transparently one-sided credibility analysis lacking in even basic reasoning.

At a minimum, the patent flaws in the ALJ's credibility findings require a remand for further consideration.

## II. THE BOARD ERRED IN CONCLUDING THAT STARBUCKS' SPEECH VIOLATED SECTION 8(a)(1)

The Board also concluded that Starbucks' conversations with employees violated Section 8(a)(1), which makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their right to organize under Section 7.  29 U.S.C. § 158(a)(1).  "[A]n employer violates § 8(a)(1) where 'under the totality of the circumstances … an employee could reasonably conclude that the employer is threatening economic reprisals if the employee supports' protected conduct."  *Renew Home Health*, 95 F.4th at 242 (quoting *Brown & Root*, 333 F.3d at 634 n.3).

Congress recognized, however, that the First Amendment permits employers to speak about unionization with their employees—and even argue against unionization—without running afoul of Section 8(a)(1).  Congress considered such speech so "important" that Congress "suffuse[d] the NLRA as a whole" with "policy judgment[s]" that "uninhibited, robust, and wide-open debate in labor disputes" and "freewheeling use of the written and spoken word" should be vigorously protected.  *Chamber of Com. v. Brown*, 554 U.S. 60, 67-68 (2008) (citation omitted).  Section 8(c) "implements the First

Amendment by requiring that the expression of 'any views, argument, or opinion' shall not be 'evidence of an unfair labor practice,' so long as such expression contains 'no threat of reprisal or force or promise of benefit.'" *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969) (quoting 29 U.S.C. § 158(c)). "To give effect to Congress's intent and avoid conflict with the First Amendment, [courts] must construe the Act narrowly when applied to pure speech." *FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 126 (3d Cir. 2022).

Under Section 8(c), an employer "is free to communicate to employees a statement of opinion about the union as well as predict the effect of unionization on the workplace so long as such a prediction is based on objectively verifiable facts and it does not contain a threat of reprisal or force." *Brown & Root*, 333 F.3d at 633; *see also Gissel Packing*, 395 U.S. at 618-19. Thus, for example, employers may lawfully "warn[] employees about the natural give and take of the bargaining process, in order to counter the idea that unionization will automatically increase compensation." *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 472 (6th Cir. 2019); *see also, e.g., UNF W., Inc. v. NLRB*, 844 F.3d 451, 458 (5th Cir. 2016) (statements regarding "reductions in wages" "made in a context … indicat[ing] … that bargaining is a process in which each side makes its own proposals, that it requires mutual

45

agreement, and where existing benefits may be traded away" not threats of reprisal (citation omitted)); *UAW v. NLRB*, 834 F.2d 816, 822 (9th Cir. 1987) (statement that "reflected the uncertainty of give-and-take collective bargaining" not threat of reprisal). "An unlawful threat is established if the totality of the circumstances reveals an employee reasonably could conclude the employer is threatening economic reprisals if the employee supports the union." *Brown & Root*, 333 F.3d at 634.

The Board thus "must be careful to distinguish what is a threat from what is constitutionally protected speech." *FDRLST Media*, 35 F.4th at 127 (cleaned up). It failed to discharge that obligation.

## A.    Starbucks Did Not Threaten Sosa with Reprisal

The ALJ concluded in one paragraph that Fuller violated Section 8(a)(1) by telling Sosa that the recently announced (but not yet implemented) national pay increase "would be put on pause" at Sylmar during the election. RE15; *see* ROA.280-281, 286.

The ALJ never made the required finding that Fuller threatened *reprisal*. Fuller merely explained employers' prerogative to withhold new benefits during elections and/or bargaining. When some "employees are seeking to bargain collectively through a statutory representative," the

46

employer may extend "wage increases to his unorganized employees" while awaiting the outcome of bargaining for others. *Merck, Sharp & Dohme Corp.*, 367 NLRB No. 122, slip op. at 3 (May 7, 2019) (quoting *Shell Oil Co.*, 77 NLRB 1306, 1310 (1946)). "[A]n employer is under no obligation under the Act to make such wage increases applicable to union members, in the face of collective bargaining negotiations on their behalf involving much higher stakes." *Id.*; *accord Arc Bridges, Inc. v. NLRB*, 861 F.3d 193, 197 (D.C. Cir. 2017). Employers also may "postpon[e] expected benefits" during an election "to avoid the appearance of election interference." *J.J. Newberry Co. v. NLRB*, 442 F.2d 897, 899 (2d Cir. 1971); *cf.* 29 U.S.C. § 158(c) (protecting employer speech "if such expression contains no … promise of benefit"). It cannot be an unfair labor practice to explain this reality to employees.

Fuller did not threaten to withhold the pay increase from the Sylmar partners to *retaliate against them for unionizing*. To the contrary, she went on to explain that if the union won the election, the benefits "would either be added on, or not, based on if the Union representative would argue for that." ROA.283, 286. In other words, she accurately explained "the natural give and take of the bargaining process." *Hendrickson*, 932 F.3d at 472. The ALJ

completely failed "to grapple with [these] countervailing portions of the record." *AllService*, 2025 WL 1482496, at *6 (citations omitted).

The ALJ cited two Board cases for the supposed proposition that "informing employees that regularly scheduled wage increases would be postponed until after the union campaign and election." RE15. But the employers there did not explain the wage increase would be the subject of bargaining, as Fuller did. *See In re Medic One, Inc.*, 331 NLRB 464, 464 (2000); *Laidlaw Waste Sys., Inc.*, 307 NLRB 52, 54 (1992).

## B. Starbucks Did Not Threaten Ramirez and Untaran with Reprisal

Reversing the ALJ, the Board concluded that Fuller violated Section 8(a)(1) in conversations with Ramirez and Untaran. That conclusion similarly ignored the whole context and penalized Starbucks for protected speech.

1. According to Ramirez, Fuller said she was opposed to unionizing because of the "*risks* that she believed we [partners] would lose benefits," and described certain education and healthcare benefits as ones "that we *could* lose through negotiations." RE2 (emphases added). As the ALJ rightly observed, Section 8(c) protects employers' right "to inform employees that benefits can be lost through the give and take of negotiations." RE14; *supra*

p.45. Statements referencing negotiations are unlawful only "when they suggest that the employer will adopt a punitively intransigent bargaining strategy." RE14; *accord Hendrickson*, 932 F.3d at 472.

As the ALJ found, Fuller "said nothing about how [Starbucks] would bargain." RE14. She did not suggest that Starbucks would adopt an "intransigent bargaining strategy" to punish partners. RE14. She simply cautioned Ramirez, truthfully, that negotiations can produce a loss of some benefits. Section 8(c) fully protects that truthful statement.

In reversing the ALJ, the Board improperly took "management statements that very emphatically assert a risk, [and] twist[ed] them into claims of absolute certainty." *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1140 (D.C. Cir. 1994). The Board faulted the ALJ for finding that Fuller said employees "could" lose benefits. RE3. According to the Board, Fuller said "employees *would* lose benefits if they unionized." RE3. Not so. Ramirez testified that Fuller referenced "the *risks* that she believed that we would lose benefits if we were going to unionize." ROA.873 (emphasis added). The Board ignored the word "risks."

The Board also concluded that Fuller violated Section 8(a)(1) because she did not "reference … how the loss of benefits … would be the result of the

give-and-take of collective bargaining." RE3. Fuller, however, stated that employees could lose benefits "through negotiations." ROA.66. To the extent the Board's complaint is that Fuller did not use the magic words "give and take," "[t]here are no magical phrases the mere incantation of which are coercive and therefore violate § 8(a)(1)." *Exxon Rsch. & Eng'g Co. v. NLRB*, 89 F.3d 228, 233 (5th Cir. 1996) (citation omitted). The question is simply whether Fuller threatened reprisal, not whether she explained the nuances of collective bargaining with the sophistication of a lawyer. *See Crown Cork*, 36 F.3d at 1140 ("if unions are free to use the rhetoric of Mark Antony while employers are limited to that of a Federal Reserve Board chairman, again the employer's speech is not free in any practical sense"). No reasonable factfinder could conclude that Fuller threatened reprisal.

2.     Untaran gave two conflicting accounts of Fuller's June 22 statement about benefits. He testified that Fuller said that (1) certain benefits, including a recently announced pay bump, "were *possibly* going to be withheld … during the negotiations for contracts with Starbucks and the Union," and (2) "all of that *was going to be* withheld during the time of negotiations." ROA.207 (emphases added). The ALJ, who witnessed Untaran's testimony firsthand, found that Fuller said benefits "could" be

withheld.  RE14.  Without explaining why it credited one account over the other, the Board improperly rejected the ALJ's finding and found that Fuller said benefits "would" be withheld.  RE3.

No matter the phrasing, Fuller was simply explaining that Starbucks was entitled to extend benefits to nonunionized partners while withholding them from unionizing partners during bargaining.  *See supra* pp.46-47.  As with Sosa, she explained that the results of bargaining were not "guarantee[d]."  ROA.207.  And she provided accurate information, based on a real-world negotiation in another Starbucks store, regarding how long bargaining can take.  ROA.207.  Fuller never threatened that Starbucks would *punish* its partners for unionizing.

Finally, the Board further erred in failing to consider that Fuller's statements, which predated Untaran's June 28 meeting with the congressman, did not chill his union activity.  Even though "[p]roof of actual coercion is unnecessary" to make out a Section 8(a)(1) violation, "employees' subjective responses can be relevant to determining whether a reasonable employee—who is familiar with her employer and the context of a remark—would tend to be coerced."  *FDRLST Media*, 35 F.4th at 122, 125.  That Fuller's statements

did not coerce Untaran is powerful evidence that her statements were not coercive.

### C.    Starbucks Did Not Threaten Pichardo with Reprisal

The ALJ's conclusion (adopted by the Board) that Starbucks' managers violated Section 8(a)(1) in their innocuous conversation with Pichardo likewise penalized Starbucks for protected speech.

1.    The ALJ first erred in concluding that Starbucks violated Section 8(a)(1) when Tayarah opined that unionization "would not change the world" or "create better conditions."  RE10.  According to the ALJ, statements that "employees' selection of union representation would be futile" violate Section 8(a)(1).  RE14.

This Court has rejected that categorical rule.  According to the Court, because Section 8(c) protects employer speech that does not threaten reprisal, statements opining that unionization will be futile are not categorically unlawful.  *Brown & Root*, 333 F.3d at 634.  For a statement of futility to constitute an unfair labor practice, it must be "accompanied by a threat or implication that *the employer will take some action to render union support futile.*"  *Id.* (emphasis added).  This Court thus demands "affirmative evidence" that the at-issue remarks "were conjoined with a threat or

implication that [the employer] would act to ensure the futility of union organization." *UNF W.*, 844 F.3d at 459.

The cases cited by the ALJ prove the point: they involved statements threatening that the employer would not respect employees' rights under the NLRA. In *UNF West, Inc.*, 363 NLRB 886 (2016), *enforced*, 844 F.3d 451 (5th Cir. 2016), for example, when an employee showed a manager a document entitled "Employee Rights Under the National Labor Relations Act," the supervisor responded, "[t]his document doesn't work here." *Id.* at 887. In *Wellstream Corp.*, 313 NLRB 698 (1994), the company president told employees that "he would personally see to it that Wellstream was never unionized." *Id.* at 706.

The ALJ never made the required finding that Tayarah threatened that Starbucks would render unionization futile. Nor could the ALJ have made such a finding. Tayarah simply expressed her view that unionizing "wouldn't change the world" (a true statement) or "create better conditions" (a personal opinion). She never said or implied that Starbucks would not bargain with employees or otherwise ignore their NLRA rights. Tayarah shared with Pichardo the basis for this opinion: she believed the Company *already*

*provided* "competitive wages, good benefits and great working conditions."
RE10.

2.    The ALJ also concluded that Tayarah violated Section 8(a)(1)
when she said there were "other jobs that offered better pay."  RE14.  The
ALJ based this conclusion in part on his conclusion that Tayarah threatened
futility in the same conversation.  RE15.  Because that conclusion was
erroneous for the reasons just discussed, this conclusion likewise cannot stand.

In any event, Tayarah in no way threatened that "support for the union
was incompatible with continued employment," as the ALJ suggested.  RE14.
She simply made the unremarkable (and true) observation that some other
jobs offer better pay.  The ALJ cited Board cases holding that "[s]uggestions
that employees who are dissatisfied with working conditions should leave
rather than engage in union activity in the hope of rectifying matters
coercively imply that employees who engage in such activity risk being
discharged."  *E.g.*, *Jupiter Med. Ctr. Pavilion*, 346 NLRB 650, 651 (2006);
RE14.  But Tayarah did not suggest that Pichardo should leave, nor did she
even hint that Pichardo risked discharge.  The ALJ's conclusion that this off-
the-cuff statement violated Section 8(a)(1) amounts to an improper "magic

phrases" rule that any statement about higher wages elsewhere coercively threatens implied discharge. *Exxon Rsch.*, 89 F.3d at 233.

## III.  THE BOARD ERRED IN CONCLUDING THAT STARBUCKS CONDUCTED A COERCIVE INTERROGATION

The Board further erred in concluding (reversing the ALJ) that Fuller coercively interrogated Untaran when she asked him "how [he] felt about unionization."  RE3 (alteration in original); *see* ROA.205-207.  This Court has found virtually the same question too "general and innocuous" to constitute coercive interrogation.  *Delco-Remy Div., Gen. Motors Corp. v. NLRB*, 596 F.2d 1295, 1310 (5th Cir. 1979).  Inoffensive questions like this one are a necessary component of protected employer-employee conversations about unions.  The Board's decision all but erects a per se rule banning any questions.

"[I]nterrogation of employees is not illegal per se." *Pioneer Nat. Gas Co. v. NLRB*, 662 F.2d 408, 415 (5th Cir. 1981) (citation omitted).  "[C]asual and moderate inquiries, even as to union preference," do not violate Section 8(a)(1).  *Dow Chem. Co. v. NLRB*, 660 F.2d 637, 650 (5th Cir. 1981).  For questioning to violate Section 8(a)(1), "either the words themselves or the context in which they are used must suggest an element of coercion or interference." *Pioneer Nat. Gas*, 662 F.2d at 415 (citation omitted).  This

Court considers eight nonexhaustive factors (the "*Bourne* factors") to determine whether questioning violates Section 8(a)(1):

(1) the background, or history of employer hostility and discrimination;

(2) the nature of the information the questioner seeks;

(3) the rank of the questioner in the company hierarchy;

(4) the place and manner of the interrogation;

(5) the truthfulness of the employee's reply;

(6) whether the employer had a valid purpose in obtaining the information sought about the union;

(7) whether a valid purpose, if existent, was communicated to the employee; and

(8) whether the employer assured the employee that no reprisals would be forthcoming should he or she support the union.

*Renew Home Health*, 95 F.4th at 243 (citation omitted). "These factors are not a mandate for formalistic analysis," and "no single factor is determinative." *Id.* at 243-44 (cleaned up).

The Board mechanically walked through five factors, but arbitrarily skewed each factor against Starbucks. As this Court has concluded in similar cases, and as the ALJ concluded below, the factors overwhelmingly favor Starbucks.

1.     The ALJ correctly concluded that "there is no history of employer hostility and discrimination at this store."   RE14.   Reversing the ALJ, the Board referenced its conclusion that Fuller "made contemporaneous statements constituting unlawful threats of economic reprisals if employees voted for the Union."   RE4.   As already discussed, she did no such thing.

2.     Most critically, the information sought—how Untaran felt about unionization—is "general and innocuous."   *Delco-Remy Div.*, 596 F.2d at 1310 ("how did I feel … about the union"); *see also, e.g.*, *Dow Chem.*, 660 F.2d at 651 ("what my feelings was [sic] about the voting and the election" not coercive); *Pioneer Nat. Gas*, 662 F.2d at 416 ("casual question").   Fuller did not probe into Untaran's voting intentions, follow up on his answer, or interrogate him about other employees.   The ALJ appropriately concluded that this "simple" question was not coercive.   RE14; *see also NLRB v. Ambox, Inc.*, 357 F.2d 138, 140-41 (5th Cir. 1966) (managers twice questioning employee "to disclose what he knew" about union support "did not carry a threat to retaliate against or interfere with union sympathizers").

3.     As the ALJ found, Fuller is a "first-line supervisor," RE14, one of the lowest-level managers in Starbucks' corporate hierarchy.   The Board arbitrarily twisted this fact against Starbucks, observing that Fuller was

Untaran's "direct supervisor and manager of the entire Sylmar store, increasing the coercive nature of the interrogation." RE4. In support, it cited a Board case highlighting that the alleged interrogator was "a statutory supervisor." RE4 (quoting *Camaco Lorain Mfg. Plant*, 356 NLRB 1182, 1183 (2011)). This reasoning improperly skews this factor against the employer *in virtually every case*, because nearly every case of alleged interrogations involves supervisors.

4.     As the ALJ found, "the conversation occurred in a public area." RE14. Although the Board emphasized that it occurred in the "back of the house," RE4, it cited no evidence that employees would be "intimidated by the place itself," *Lord & Taylor v. NLRB*, 703 F.2d 163, 167 (5th Cir. 1983) ("training room" not intimidating). Moreover, the Board entirely ignored the evidence that the exchange was "casual and friendly." *Delco-Remy Div.*, 596 F.2d at 1310; *see also Lord & Taylor*, 703 F.2d at 167 ("remarks were made between two persons who admittedly were on a first name basis and were casual inquiries"). According to Untaran, Fuller began the conversation by saying "thank you for sitting down, having a chat with me." ROA.206. There was no evidence of "systematic" questioning of employees. *Delco-Remy Div.*,

596 F.2d at 1310. There was nothing coercive about this calm, one-off conversation.

5.    The ALJ correctly found that Untaran answered the question truthfully ("if we had more people and it didn't feel like we were getting overwhelmed, everything — at night, for closing shift, then I felt like the unionization wouldn't have been necessary"), further weighing against coercion. RE14; ROA.205. The Board again found the opposite, reasoning that Untaran "did not answer" the question "completely candidly." RE4. It cited no evidence for this finding. In any event, a lack of complete candor does not require a conclusion of coercion. *See Ambox*, 357 F.2d at 141 (no coercion where employee "avoided answering" manager's question by saying, "You know as much about it as I do"). The Board also failed to consider that the question did not chill Untaran's union activity. *Supra* p.51.

6-7.    Although Fuller's motivation for posing the question is unclear from the record, the question has a demonstrably proper purpose: Fuller was attempting to exercise Starbucks' protected right to discuss unionization with employees. If front-line supervisors cannot begin a respectful conversation about unionization with generic questions like this one, how are they supposed to have such conversations?

8.    Although there was no evidence that Fuller expressly disclaimed reprisal during the conversation, "this alone would not be enough to constitute a section 8(a)(1) violation." *Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245, 1257 (5th Cir. 1992).

In sum, if calmly asking an employee how he feels about unionization is a coerced interrogation, then all questions are off limits. That is not the law. *Supra* p.55. The Court should deny enforcement.

## IV.    THE BOARD'S ORDERED REMEDIES ARE UNLAWFUL

### A.    The Evidence Does Not Support the Ordering of a Second Election

The ALJ sustained the union's objections to the Sylmar election based on his conclusions that (1) Starbucks discharged Untaran for his union activity, (2) Fuller threatened Sosa with a loss of benefits, and (3) Tayarah threatened Pichardo with futility. RE17. The ALJ concluded that the statements to Sosa and Pichardo "might not have been enough to have affected the outcome of the election," but concluded that Untaran's discharge was sufficiently significant to warrant a new election. RE17. If the Court denies enforcement as to Untaran's discharge, then, it should vacate the order for the second election, as well as the remedies associated with the discharge (reinstatement and make-whole relief).

### B.    The Board's Damages Remedy Is Unlawful

At a minimum, this Court should vacate the Board's award of compensatory damages to Untaran.  In *Thryv, Inc.*, the Board asserted authority to award employees compensation for "all direct or foreseeable pecuniary harms."  372 NLRB No. 22, slip op. at 1 (NLRB Dec. 13, 2022), *vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024).  Below, the Board awarded the same remedy, compelling Starbucks to compensate Untaran for any "direct or foreseeable pecuniary harm[] suffered as a result of his" termination.  RE5.

That broad remedy exceeds the Board's powers.  Section 10(c) confines the Board to traditional equitable remedies, *i.e.*, ordering the cessation of unfair labor practices or "affirmative action … as will effectuate the policies of" the Act.  29 U.S.C. § 160(c).  Yet, in *Thryv*, the Board asserted authority to authorize compensatory damages—"the classic form of *legal* relief."  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993); *see also Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).  That position finds no support in the statute and raises grave constitutional concerns.

This Court has already deemed the Board's *Thryv* remedy "a novel, consequential-damages-like labor law remedy."  *Thryv*, 102 F.4th at 737.

Other courts and judges agree. *See NLRB v. Starbucks Corp.*, 125 F.4th 78, 96-97 (3d Cir. 2024) (holding that the *Thryv* remedy is an award of "compensatory damages" that "exceeds the Board's authority under the NLRA"); *3484, Inc. v. NLRB*, 137 F.4th 1093, 1121-27 (10th Cir. 2025) (Eid, J., concurring in part and dissenting in part) (similar). Of the circuits to have reached the question, only the Ninth Circuit has upheld the Board's *Thryv* remedy, over a vigorous dissent. *Int'l Union of Operating Eng'rs v. NLRB*, 127 F.4th 58, 79-88 (9th Cir. 2025); *but see id.* at 88-99 (Bumatay, J., dissenting). This Court should confirm that neither the NLRA nor the Constitution permits the Board to award compensatory damages.

1. The Board ordered Starbucks to make Untaran "whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms, suffered as a result of his unlawful termination." RE5. This includes a stunning array of damages such as credit card debt, withdrawals from retirement accounts, car loans, mortgage payments, childcare, immigration expenses, and medical expenses. *Thryv*, 372 NLRB No. 22, slip op. at 15. *Thryv* damages are a classic compensatory damages remedy, because they "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut.*

*Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted); *see also Thryv*, 102 F.4th at 737. The Board's own manual confirms that certain expenses, "such as the loss of a car or house due to the discriminatee's inability to make monthly payments" are "compensable damages." NLRB, *Casehandling Manual, Part 3, Compliance Proceedings* § 10536.1 (Oct. 19, 2020), https://tinyurl.com/ycketcuj.

2. The NLRA does not authorize compensatory damages. The statute's text, context, and history all confirm that the NLRA "limits the Board's remedial authority to equitable, not legal, relief." *Starbucks*, 125 F.4th at 95.

Start with the text. Section 10(c) allows the Board to order employers to "take … affirmative action," such as "reinstatement … with or without back pay," or to compel inaction, *i.e.*, to "cease and desist." 29 U.S.C. § 160(c). That remedial power captures equity to a T: Equity "compel[s] action or inaction." Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553 (2016); *Ex parte Lennon*, 166 U.S. 548, 556 (1897) (explaining that courts of equity could order "restraint of a contemplated or threatened action" and "even require affirmative action").

Likewise, although Section 10(c) authorizes the Board to award monetary relief in the form of "back pay," such relief "is based on what an

employer has wrongfully withheld," and thus qualifies as "an equitable remedy, a form of restitution." *Starbucks*, 125 F.4th at 96 (quoting *Curtis v. Loether*, 415 U.S. 189, 197 (1974)); *see also* Dan B. Dobbs, 1 Law of Remedies 280 (2d. ed. 1993) ("To measure restitution, courts look at the defendant's gain or benefit."). The Supreme Court has repeatedly described the Board's Section 10(c) authority in purely equitable terms. *See, e.g.*, *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 177-78 n.4 (1973); *see also Starbucks*, 125 F.4th at 95-96 (discussing additional precedents).

Statutory context and history confirm the point. Congress "modeled" Title VII's remedial provision—Section 706(g)—on Section 10(c). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975). The Supreme Court has held that Section 706(g) "does not allow awards for compensatory ... damages." *United States v. Burke*, 504 U.S. 229, 238 (1992); *Int'l Union*, 127 F.4th at 94-95 (Bumatay, J., dissenting). When Congress wants to authorize compensatory damages, Congress says so directly and ensures that a court— not an agency—decides the case. *See, e.g.*, 29 U.S.C. § 187(b) (Labor Management Relations Act); 29 U.S.C. § 2617(a)(1)(A)(i)(II) (Family and Medical Leave Act).

Reading Section 10(c) to authorize compensatory damages would create serious anomalies. In 1947, Congress amended Section 10(c) to prohibit the Board from ordering reinstatement or back pay where the employee "was suspended or discharged for cause." *See Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 217 (1964). If the Board could order compensatory damages, that restriction would make no sense—the Board "would be precluded from awarding back pay when the employee commits misconduct, but … still grant the same employee foreseeable or consequential damages." *Int'l Union*, 127 F.4th at 93 (Bumatay, J., dissenting).

3. The Board's contrary interpretation would infringe Article III and the Seventh Amendment.

Article III and the Seventh Amendment reserve the power of adjudicating private damages suits to courts and juries. Under Article III, claims involving private rights—that is, rights involving "the liability of one individual to another"—must be decided by "Article III judges in Article III courts." *Stern v. Marshall*, 564 U.S. 462, 484, 489 (2011) (citations omitted). Likewise, under the Seventh Amendment's jury-trial guarantee, cases involving private rights must also include the "right to a jury trial whenever the cause of action is legal in nature." *Granfinanciera, S.A. v. Nordberg*, 492

U.S. 33, 53 (1989); *see also SEC v. Jarkesy*, 603 U.S. 109, 122-23 (2024) (the Seventh Amendment guarantees the right to a jury trial for claims involving "money damages"). Together, these rights ensure that only courts—not agencies—adjudicate private rights, and that juries—not agencies—award common-law remedies.

The Board's interpretation would violate both constitutional guarantees by arrogating to the agency the power to impose compensatory damages. Claims for compensatory damages involve "the liability of one individual to another" akin to tort and contract claims—classic private rights that courts must adjudicate. *Stern*, 564 U.S. at 489-90 (citation omitted). And allowing the Board to issue such awards improperly hands an agency instead of a jury the right to impose a "prototypical common law remedy." *Jarkesy*, 603 U.S. at 109.

Nor can such concerns be shrugged off by suggesting that the *Thryv* remedy involves only "public rights." Congressionally created rights are not exempt from the Seventh Amendment. Courts must still examine the "nature" of the proceeding to determine whether agencies are impermissibly adjudicating private rights. *Oil States Energy Servs. v. Greene's Energy Grp.*,

584 U.S. 325, 340 (2018) (citation omitted). *Thryv* damages squarely implicate

private rights.

## CONCLUSION

The Court should deny enforcement.

Respectfully submitted,

JEFFREY S. HILLER                           *s/ Lisa S. Blatt*
LITTLER MENDELSON, P.C.            LISA S. BLATT
  *41 S. High Street, Ste. 3250*        AMY MASON SAHARIA
  *Columbus, OH 43215*                 MARK S. STORSLEE
                                                        CLAIRE R. CAHILL
JONATHAN O. LEVINE                   WILLIAMS & CONNOLLY LLP
LITTLER MENDELSON, P.C.              *680 Maine Avenue, S.W.*
  *1111 E. Kilbourn Avenue, Ste. 1000*   *Washington, DC 20024*
  *Milwaukee, WI 53202*                  *(202) 434-5000*
                                                        *lblatt@wc.com*

                                                        *Counsel for Petitioner/Cross-*
                                                        *Respondent*

DATED: JUNE 16, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system. I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

DATED: JUNE 16, 2025

*s/ Lisa S. Blatt*

LISA S. BLATT

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Brief of Petitioner/Cross-Respondent contains 12,990 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point CenturyExpd BT.

DATED: JUNE 16, 2025                     *s/ Lisa S. Blatt*
                                          LISA S. BLATT